IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EDWARD PHILPOT HICKMAN,          )
AIS #285076,                     )
                                 )
            Plaintiff,            )
                                 )      CIVIL ACTION NO. 2:15-cv-352-WKW
      v.                          )      [WO]
                                 )
KARLA JONES, *et al.*,            )
                                 )
            Defendants.

## RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

Plaintiff Edward Philpot Hickman is a former inmate of the Easterling Correctional Facility ("Easterling") in Clio, Alabama, within the Alabama Department of Corrections ("ADOC"). He filed this action under 42 U.S.C. § 1983, alleging that prison officials at Easterling were deliberately indifferent to his right to be safe from assault by a fellow inmate, Robert Davis, in July 2014; and that medical officials at Easterling were deliberately indifferent to his serious medical needs. Doc. 1. Plaintiff names as defendants Kim T. Thomas, Karla Jones, Luther Strange, James DeLoach, Gwendolyn Mosley, Kenneth Sconyers, Derrick Carter, Brian Thompkins, James Griffin, Stephanie Jetton,[1] Justin Moore, and William Bonner (collectively the "ADOC Defendants"). Plaintiff also names as defendants Corizon Medical Service ("Corizon"), Dr. Jean Darbouze, and Kay

---

[1] Plaintiff spelled Jetton's name as "Jaton" and Griffin's name as "Griffith," but these defendants have appeared and have provided the correct spellings for their names. Docs. 41-4 & 41-10. The Clerk of the Court is DIRECTED to correct Plaintiff's misspellings on the court's docket.

Wilson (collectively the "Medical Defendants"). Doc. 1. Plaintiff sues Defendants in their official capacities, and he also sues all but Corizon in their individual capacities. Doc. 1 at 2–4. Plaintiff requests declaratory relief and damages. Doc. 1 at 21.

Defendants filed answers, special reports, supplemental special reports, and evidentiary materials addressing Plaintiff's claims for relief. Docs. 40, 41, 55, 61, 62, 64, 71, 83, 84, 86, 95, 107, 113, 114 & 116. Upon receipt of Defendants' reports, the court directed Plaintiff to file a response, including sworn affidavits and other evidentiary materials, and specifically cautioning Plaintiff that "at some time in the future the court may treat the defendants' reports and the plaintiff's response as a dispositive motion and response." Doc. 42 at 3. Plaintiff responded to Defendants' reports and materials. Docs. 74, 94, 115 & 117.

The court now will treat Defendants' reports as motions for summary judgment, and the court will treat the Medical Defendants' argument that Plaintiff failed to exhaust his administrative remedies before filing suit as a motion to dismiss.[2] Upon consideration of the motions, the responses, and the evidentiary materials filed in support and in opposition to the motion, the court concludes that the motion to dismiss is due to be DENIED and the motions for summary judgment are due to be GRANTED.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[2] "[A]n exhaustion defense . . . is not ordinarily the proper subject for a summary judgment [motion]; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant v. Rich*, 530 F.3d 1368, 1374–75 (11th Cir. 2008) (internal quotations omitted).

of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating that there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24.

Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (holding that the court should consider facts pled in a plaintiff's sworn complaint

when considering summary judgment). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); Fed. R. Civ. P. 56(e). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice . . . ." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252). Only disputes involving material facts are relevant, and what is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248. To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . 'Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.'") (citation omitted). "Conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion."

*Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact). Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the court, a *pro se* litigant does not escape the burden of sufficiently establishing a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, a plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. Here, Plaintiff fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on his claims against Defendants. *See Matsushita*, 475 U.S. at 587.

## III. DISCUSSION

### A.    Absolute Immunity

Plaintiff sues Defendants in their official capacities. The ADOC Defendants argue that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment. Doc. 41 at 5. Official capacity lawsuits are "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). State officials may not be sued in their official capacity for money damages unless the state has waived its Eleventh Amendment immunity or unless Congress has abrogated the state's immunity, and neither has occurred in this case. *See Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997) (citing *Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996)

(discussing abrogation by Congress); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984) (discussing Eleventh Amendment immunity); *Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (finding that Alabama has not waived Eleventh Amendment immunity)). In light of the foregoing, Defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for Plaintiff's claims seeking monetary damages from them in their official capacities. The claims for money damages brought against Defendants in their official capacities are therefore due to be dismissed.

## B.    ADOC Defendants

Plaintiff claims that the ADOC Defendants were deliberately indifferent to his safety when they failed to protect him from assault by Davis on July 26, 2014. The ADOC Defendants assert that they are entitled to qualified immunity on Plaintiff's claim against them in their individual capacities for monetary damages. Doc. 41 at 5–11. They further argue they cannot be held liable based on supervisory liability. Doc. 41 at 11–12.

### 1.    *Qualified Immunity*

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*

*v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted). To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that Defendants here were acting within the course and scope of their discretionary authority when the incident occurred. Plaintiff must, therefore, allege facts that, when read in a light most favorable to him, show that Defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy his burden, a plaintiff must show two things: (1) that a defendant committed a constitutional violation and (2) that the constitutional right a defendant violated was "clearly established." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). "Clearly established law" means (1) "a materially similar case has already been decided"; (2) "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208–09 (11th Cir. 2017) (quotation marks and citations omitted). The controlling authority is from "the United States Supreme Court, the Eleventh Circuit, or the highest court in the relevant state." *See id.* at 1209. "Qualified immunity gives government officials

breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). The Eleventh Circuit "has stated many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Gaines*, 871 F.3d at 1210. "Exact factual identity with the previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011). If a plaintiff cannot establish both elements to satisfy his burden, the defendants are entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42).

### 2. Summary of Material Facts

For purposes of considering the ADOC Defendants' motion for summary judgment, the court views the facts in the light most favorable to Plaintiff, the nonmoving party. On July 26, 2014, Plaintiff was an inmate at Easterling. Doc. 1. He now resides at the Red Eagle Work Center in Montgomery, Alabama. Doc. 117. During the time relevant to Plaintiff's claims, Strange was the Alabama Attorney General; Thomas was the ADOC Commissioner; DeLoach had retired from his position as Associate Commissioner on July 1, 2014, and was no longer working at Easterling on the night of the attack; Mosley was the ADOC Institutional Coordinator; and Jones, Carter, and Sconyers were Wardens at Easterling. Docs. 41, 41-6, 41-7, 41-8, 41-9, 41-11, 41-12, 114-5, 114-7, 114-8, 114-10, 114-11 & 116-1. Griffin was a Lieutenant at Easterling but was on annual leave and

therefore not at work the night Plaintiff was assaulted. Docs. 41-10 & 114-9. Thompkins was a Lieutenant at Easterling and the Night Shift Commander on the night of the assault, and he responded to the assault. Docs. 41-3 & 114-2. Jetton was a Sergeant at Easterling and the Night Assistant Shift Commander on the night of the assault, and she responded to the assault. Docs. 41-4 & 114-3. Bonner was a Correctional Officer assigned to the post of Dorm G Cubicle on the night of the assault, and he responded to the assault. Docs. 41-2 & 114-1. Moore was a Correctional Officer assigned to the post of Dorm G rover at Easterling on the night of assault, and he responded to the assault. Docs. 41-5 & 114-4.

On July 26, 2014 at around 10:30 p.m. or 11:00 p.m., Plaintiff was sleeping in his bunk in Dorm G1, which is an open dorm at Easterling, a security Level IV Medium Security facility. Docs. 1 at 8, 64-1, 64-2, 64-3 & 114-7. Inmate Robert Davis was in his bunk in the same dorm. Davis got up, heated shaving powder and baby oil in a cup in a microwave, and threw it on Plaintiff's head, neck, shoulders, and back. Docs. 1 at 7 & 64-3. Startled and burning, Plaintiff rolled out of bed, and Davis began hitting and stabbing Plaintiff with a shank made from the metal leg of a chair. Docs. 1 at 8, 64-2 & 64-3. Plaintiff states that it felt as if more than one person attacked him and the assault lasted ten minutes before other inmates shouted "the guards are coming." Doc. 1 at 8. Plaintiff did not consider Davis an enemy, was surprised by the attack, and offered no reason "whatsoever" why the attack happened to him. Doc. 64-2 at 3. Plaintiff was stabbed nine times and suffered stage 2 burns to his scalp, neck, shoulders, and back. Doc. 37-4 at 9 & 13; Doc. 83.

Davis admitted attacking Plaintiff. Docs. 64-1 & 64-3. In an interview about the

assault, Davis said he became angry when he saw Plaintiff masturbating so he got out of bed to vomit, then mixed and heated the shaving powder and oil, threw it on Plaintiff, and began punching him. Davis said he "ran back and got the knife; it was a knife that everybody have in the dorm; that a lotta people have in the dorm; I grabbed it and I stuck him; I didn't think I stuck him that many times." Docs. 64-1 & 64-3 at 4. After internal investigation, the assault was referred for prosecution. Doc. 64-1.

Bonner, who was assigned as Dorm G1 Cubicle officer, was the first officer to respond to the attack. Doc. 41-1. According to an incident report, at about 11:36 p.m., Bonner saw inmates gathering in the back of Dorm G1, and he reported the incident to Jetton at 11:37 p.m. Doc. 41-1 at 2. Jetton and Thompkins arrived, and Jetton saw Plaintiff walking towards the front of the dorm, covered in shaving powder and blood. Docs. 41-1, 41-2, 41-3, 41-4, 114-1, 114-2 & 114-3. Officers escorted Plaintiff to the health care unit for treatment. Doc. 114-3.

Moore, who was assigned as Dorm G1 rover officer, should have been at his post, but he had left it to submit a report to the shift office regarding an inmate-on-inmate assault incident involving sexual harassment between different inmates that occurred at about 9:30 p.m. Docs. 84-1, 114-3 & 114-4. The rover is the primary line of security in the institution, conducts shakedowns "to eliminate the flow of contraband," and "must be constantly patrolling in their assigned areas. When a disturbance or unusual incident occurs, the Rover will normally be the first officer on the scene." Doc. 84-1 at 2–3. Moore left his post even though he had not been relieved by another officer, in violation of policy. Docs. 84-1 at 3 & 86. Moore returned to the dorm at about 11:37 p.m. Doc. 114-4. He

arrived at Plaintiff's assault after Jetton. Doc. 114-4.

At about the time of the attack, Easterling was at 234.7 percent capacity. Doc. 114-12 at 4. Jetton avers there were 1533 inmates in Easterling that day with 20 officers at work covering 25 posts.[3] Doc. 114-3 at 1. Over the ten months preceding Plaintiff's assault, Easterling had 39 incidents of inmate-on-inmate assault, and six of those involved serious injury.[4] Doc. 114-12 at 12. There was one documented inmate-on-inmate assault in Dorm G from January 1 to July 25, 2014. Doc. 86 at 1. According to Jones, Dorm G had a cubicle officer assigned to the cubicle, and a rover assigned to the inmate living area. Doc. 114-7. The duty post assignment sheet for July 26, 2014 lists two rovers under "Cubicle G," but one of them has "kitchen" next to the name (the other rover's name is Moore). Doc. 95-1. The ADOC Defendants generally state they did not have control over the number of inmates housed at Easterling. According to Jones, who was responsible for the daily operations of Easterling, including ensuring adequate security coverage, a mandatory overtime program had been implemented at Easterling that required each officer to work at least two of their scheduled days off each pay period. Docs. 41-8 & 114-7. Plaintiff alleges that Jones instituted the mandatory overtime policy only after his attack, but the duty post assignment sheet for July 26, 2014 lists six persons under "mandatory overtime," though three of those six are also listed under "military" or "annual" designations. Docs. 1 at 14 & 95-1. Thomas avers that his staff took deliberate actions to control and reduce the

---

[3] Jones states that there were about 1500 inmates, a staff of 125 security officers split into 4 shifts, and 23 officers on duty during the shift when the assault occurred. Docs. 86 at 1 & 114-7.
[4] The ADOC report is dated July 7, 2014, and covers the fiscal year, which began in October 2013. The report also documents an additional 27 "fights" between inmates. Doc. 114-12 at 2 & 12.

prison population, including efforts to increase community corrections programs, and increase funding and divert offenders to the programs. Doc. 114-10 at 2. Thomas further avers the ADOC population exceeded capacity for many years before he became Commissioner and, to the best of his knowledge, the inmate population declined during his tenure. Doc. 114-10.

Defendants Strange, Thomas, DeLoach, and Mosley had no personal involvement in Plaintiff's assault. Docs. 1, 41-9, 41-11 & 41-12. Defendant Carter worked under Jones, has no knowledge about staffing on Dorm G on the night of the assault, acknowledges the institution uses mandatory overtime to ensure security when there are staff shortages, states that inmate-on-inmate violence occurs despite efforts to prevent it, and does not believe ADOC officials violated Plaintiff's rights. Docs. 41-7 & 116-1. Defendant Sconyers states that he had no role in determining the security staff, acknowledges that the institution uses voluntary and mandatory overtime to ensure coverage of security posts, states that inmate-on-inmate violence can occur at any time regardless of staffing, and denies violating Plaintiff's right to safety. Docs. 41-6.

### 3.    *Applicable Law*

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 844–45 (1994) (internal quotation marks and citations omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id*. at 834.

Officials responsible for prison inmates may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows that the inmate faces "a substantial risk of serious harm" and with that knowledge disregards the known risk by failing to take reasonable measures to abate it. *Id.* at 828. "Within [a prison's] volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of . . . the prison staffs and administrative personnel. . . . They are [also] under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). The Eleventh Circuit has, however, stressed that a "prison custodian is not the guarantor of a prisoner's safety." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990); *Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga.*, 400 F.3d 1313 (11th Cir. 2005) (same). "Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.'" *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014) (quoting *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028–29 (11th Cir. 2001)).

The law is settled that both objective and subjective elements are necessary components of a violation of the protections afforded by the Eighth Amendment. *Caldwell*, 748 F.3d 1099. With respect to the objective elements of a deliberate indifference claim, an inmate must first show that "an objectively substantial risk of serious harm" existed. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

13

and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38. The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, [providing security for inmates], or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

A defendant's subjective knowledge of the risk must be specific to that defendant because "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. . . . Each individual Defendant must be judged separately" and on the basis of what that person knew at the time of the incident. *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Moreover, "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a [state official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted). "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*; *see also Harris v. Prison Health Servs.*, 706 F. App'x 945, 951–52 (11th Cir. 2017) (recognizing conflicting circuit precedent on deliberate indifference standard, but concluding the controlling

standard is "more than mere negligence" not "more than gross negligence") (citing *Melton v. Abston*, 841 F.3d 1207, 1226 n.2 (11th Cir. 2016)). Thus, a prison official may avoid Eighth Amendment liability for failure to protect an inmate in any one of three ways: (1) by demonstrating that the official was not aware "of the underlying facts indicating a sufficiently substantial danger" and was "therefore unaware of a danger"; (2) by admitting awareness of "the underlying facts" of a substantial danger, but "believ[ing] (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) by showing that the official "responded reasonably" to a known substantial danger, "even if the harm ultimately was not averted." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 618 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 844) (internal quotation marks omitted).

Consequently, to proceed beyond the properly supported motion for summary judgment filed by Defendants, Plaintiff must provide evidence that an objectively substantial risk of serious harm existed toward him from his attacker and that Defendants disregarded that known risk by failing to respond to it in an objectively reasonable manner. If he establishes these objective elements, Plaintiff also must satisfy the subjective component. To do so, Plaintiff must submit evidence showing that Defendants subjectively knew that Plaintiff faced a substantial risk of serious harm—that is, Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they drew the inference. *See Caldwell*, 748 F.3d at 1099–1100 (quoting *Farmer*, 511 U.S. at 837).

### 4. *Discussion*

Plaintiff did not warn Defendants that Davis posed a danger to him, and in fact Plaintiff admitted that he had no knowledge of why Davis attacked him. Nothing in the record suggests that Defendants previously identified Davis as a violent inmate who posed a risk to Plaintiff or anyone else. Plaintiff's case is therefore unlike that where a prisoner was housed separately with mentally ill inmates and was left unsupervised with an inmate who "had a history of violent outbursts and mental instability and was in the midst of a violent schizophrenic outrage prior to his murdering the plaintiff." *Cottone*, 326 F.3d at 1358. Plaintiff has not created a genuine dispute whether any defendant, and in particular Officer Moore, who left his post, was aware of a particular risk that Davis posed to Plaintiff. In this regard, Moore's acts were at most negligent, and insufficient to show an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835. After the officers learned of the assault—including Moore, Bonner, Jetton, and Thompkins—they took immediate action to stop it and to ensure Plaintiff received treatment. None of these Defendants responded with deliberate indifference to Plaintiff's assault. *See id.* at 837.

Thus, to show an Eighth Amendment violation, Plaintiff would have to demonstrate the general conditions in his dorm were known to be so violent or unsafe that Moore or the other Defendants would have inferred that they posed a substantial risk to Plaintiff's safety, and they responded unreasonably to that risk. Defendants acknowledge the institutional population was more than twice its intended capacity. But overcrowding in prison is not, in itself, unconstitutional, and "there is nothing inherently wrong with having only a few staff members supervise inmates." *Laube v. Haley*, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002). If Moore had been at his post, it is possible the assault would have been discovered

earlier, but the record does not suggest that Moore could have prevented it from happening, or that Moore actually knew Plaintiff faced a substantial risk of serious harm and responded to that risk in an objectively unreasonable manner. Here, unlike in *Cottone*, there is no evidence in the record that the dorm housed known, dangerous inmates, or that Davis was one of them. *Cottone*, 326 F.3d at 1359 (concluding plaintiff stated Eighth Amendment violation and there was clearly established law that "a lack of monitoring and supervision of known violent inmates, which led to inmate-on-inmate violence, constituted impermissible unconstitutional conduct"). There was an incident of violence earlier in the evening on July 26, 2014, but there was only one documented inmate-on-inmate assault in Dorm G in the seven months leading up to that incident. Based on this record, Plaintiff has not shown that inmates in the dorm had "an unjustified constant and unreasonable exposure to violence," or that Moore "had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence" and responded unreasonably to that risk by leaving his post on this one occasion. *See Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1581, 1583 (11th Cir. 1995) (denying summary judgment where sheriff knew violence was occurring on a regular basis during the month in a 13-by-20-foot day cell that often held 13 or more inmates); *LaMarca v. Turner*, 995 F.2d 1526, 1532 (11th Cir. 1993) (holding that prisoner presented sufficient evidence of deliberate indifference when, among other things, officers knew inmates were using drugs and knives, some officers profited from contraband, staff vacancies were high and morale was low, incidents of violence against inmates were not investigated, and officers were supposed to patrol the dorms regularly but did not). Plaintiff also does not show that the other officers on duty—Bonner, Jetton, and Thompkins—

responded unreasonably to a known, generalized risk of substantial harm when they did not react to Moore leaving his post or ensure the rover position was covered. *See LaMarca*, 995 F.2d at 1537 ("Mere knowledge of the infirm conditions persisting at [the prison] does not establish deliberate indifference. The plaintiffs must also demonstrate that, with knowledge of the infirm conditions, [the prison official] knowingly or recklessly declined to take actions that would have improved the conditions."). Consequently, Plaintiff does not create a genuine dispute of material fact on his Eighth Amendment claim against Moore, Bonner, Jetton, and Thompkins, and summary judgment is due to be granted in their favor. *See* Fed. R. Civ. P. 56; *Rehberg*, 611 F.3d at 839 (holding that defendants entitled to qualified immunity if a plaintiff does not show a defendant committed a constitutional violation).

The other supervisory officials—Strange, Thomas, DeLoach, Mosley, Jones, Sconyers, Carter, and Griffin—did not personally participate in the alleged unconstitutional acts. But *respondeat superior* is not a basis of liability under § 1983, and if a supervisor does not participate personally in the alleged unconstitutional act, there must be "a causal connection between actions of a supervising official and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360; *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–92 (1978); *see also Nam Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1283 (11th Cir. 2017) ("In light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability."). To establish the requisite causal connection and avoid entry of summary judgment in favor of the supervisory defendants, Plaintiff must present sufficient evidence that would be admissible

at trial of "a history of widespread abuse [that] put[] [the supervisory defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so," a "custom or policy [that] result[ed] in [violation of his] constitutional rights, or . . . facts [that] support an inference that [the supervisory defendants] directed the [supervised defendants] to act unlawfully, or knew that [they] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (citations omitted).

A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that Plaintiff has not met this burden. The record before the court contains no evidence to support an inference that the supervisory defendants directed correctional officials to act unlawfully or knew that they would act unlawfully and failed to stop them. In addition, Plaintiff presents no evidence of obvious, flagrant, or rampant abuse of a continuing duration. Finally, the challenged actions did not occur pursuant to a custom or policy enacted by the supervisory defendants. Thus, the required causal connection does not exist between the challenged actions of correctional officials and their supervisors, and liability under the custom or policy standard is not warranted.

Even assuming that there was a substantial risk to Plaintiff from overcrowding, Jones, who was responsible for staffing, used mandatory overtime to ensure sufficient coverage for security posts, and Thomas, the Commissioner, took steps to reduce prison overcrowding in general. The amount of inmate-on-inmate violence in the dorm was unlike that described in *Laube*, where inmates fought for access to ice and fans during unrelenting heat, and the institution had the highest assault rate of any ADOC institution. *Laube*, 234 F. Supp. 2d at 1237. There is no basis on which the court could conclude that Jones and

Thomas reacted to the threat posed by overcrowding in Plaintiff's dorm in an objectively unreasonable manner. *See Farmer*, 511 U.S. at 837–38. In addition, the Defendants did not cross a bright line of clearly established law in July 2014 that suggests their actions were "plainly incompetent." *See Messerschmidt*, 565 U.S. at 546.

Consequently, Plaintiff does not create a genuine dispute of material fact on his Eighth Amendment claim against Strange, Thomas, DeLoach, Mosley, Jones, Sconyers, Carter, and Griffin, and summary judgment is due to be granted in their favor.

## C.    Medical Defendants

Plaintiff claims that the Medical Defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs after he was assaulted. The Medical Defendants argue that Plaintiff's claims against them are due to be dismissed because he failed to comply with the exhaustion requirement in the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Doc. 37 at 21–24. They further argue they are entitled to summary judgment on the merits of Plaintiff's claims.[5] Doc. 37 at 7–16.

### 1.    Exhaustion

Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." All claims about prison life must be exhausted before filing suit if there is an available administrative remedy—regardless of whether the relief that the

---

[5] Because the Medical Defendants are employed by a private entity and not the state of Alabama, they are not entitled to qualified immunity. *See Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), *amended at* 205 F.3d 1264 (11th Cir. 2000).

prisoner seeks is available in the administrative remedy. *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002). The exhaustion requirement is an affirmative defense not a jurisdictional or a pleading requirement. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Woodford v. Ngo*, 548 U.S. 81, 101 (2006) (noting that "the PLRA exhaustion requirement is not jurisdictional"); *Bryant*, 530 F.3d 1374–75 & n.10. There is an exception to the exhaustion requirement that allows a prisoner to file suit when the administrative remedy is not "available," meaning that the grievance procedure is not "'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). The Supreme Court has held that the administrative procedure is unavailable when "it operates as a simple dead end," or is "so opaque that it becomes, practically speaking, incapable of use." *Id.* And it could also be unavailable because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The court conducts a two-step inquiry in applying § 1997e(a). *See Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008). First, the court considers the parties' versions of the facts, and where they conflict must take the plaintiff's version as true. *Id.* at 1082. If, based on the plaintiff's version, the claim is unexhausted, the court must dismiss the claim. *See id.* Second, if the case cannot be dismissed based on plaintiff's version and there are factual disputes, "the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion. The defendants bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." *Id.* (citations omitted).

It is undisputed that Corizon provides an administrative remedy for inmate complaints regarding medical treatment in the form of an inmate grievance procedure, and that Plaintiff never filed a grievance. Doc. 37-2. Plaintiff claims that he tried to obtain grievance forms on multiple occasions from different sources but got "the run around." Doc. 74-1 at 6. He was told the forms were available in one location, then told they were in another location, and at any rate they were not readily available to inmates at Easterling. *Id.* Consistent with the two-step procedure outlined above, the court accepts Plaintiff's version of the facts and finds that the grievance procedure was not "available to him" because it either was so opaque that it was incapable of use or he was thwarted in his attempts to use it. *See Ross*, 136 S. Ct. at 1859–60. Consequently, the Medical Defendants have not met their burden to show lack of exhaustion, and their motion to dismiss based on § 1997e(a) is due to be denied. The court now turns to the merits of Plaintiff's claim against the Medical Defendants.

### 2.    *Summary of Material Facts*

During the time relevant to Plaintiff's claims, Corizon was a private medical provider contracted to provide medical care to ADOC inmates, Dr. Darbouze was Corizon's Medical Director at Easterling, and Wilson was a Registered Nurse for Corizon at Easterling. Wilson is the Health Services Administrator for Corizon at Easterling. Wilson did not provide hands-on medical care for Plaintiff. Doc. 37-2 at 3. Wilson avers that, to her knowledge, Plaintiff received medical care within the appropriate standard of care. Doc. 37-2 at 4.

At 11:55 p.m. on July 26, 2014, a nurse who is not named as a defendant evaluated

Plaintiff for his injuries following the assault. Doc. 37-4 at 9. The treatment notes do not indicate Plaintiff received medications. Doc. 37-4 at 9. Plaintiff states that the health services staff bandaged some, but not all, of his wounds, and that he received no pain medication while waiting to leave for the hospital. Doc. 1 at 17. The nurse notified Darbouze about the injuries, and at about 12:20 a.m. Darbouze ordered Plaintiff to be transported to the hospital. Doc. 37-4 at 4 & 48; Doc. 41-1 at 3. Plaintiff maintains that the medical staff should have called for an ambulance immediately after the assault, and the delay in treatment caused him to suffer prolonged and extreme pain from his injuries. Doc. 1 at 17. But Corizon and its employees have no authority or responsibility for transporting inmates to the hospital. Doc. 55 at 6. Medical records indicate that Plaintiff was released to ADOC custody for transport at 1:12 a.m. Doc. 37-4 at 48. According to the correctional officer's incident report, however, the nurse examined Plaintiff at about 1:25 a.m., and at 1:37 a.m., Plaintiff was released to the ADOC for transport. Doc. 41-1 at 3.

It is undisputed that ADOC guards transported Plaintiff to the hospital in Troy, Alabama, arriving at 2:16 a.m. Doc. 107-1 at 4. Medical staff at the hospital moved Plaintiff to a room at 2:45 a.m. and began his examination at about 3:00 a.m. Docs. 37-4 at 11 & 107-1 at 4. Staff examined Plaintiff and treated him with Silvadene cream on the affected areas, then covered these areas with dry gauze and taped them for security.  They also administered Norco 10/325 mg. Doc. 37-4 at 13–15 & 107-1 at 5–6. Plaintiff was discharged at about 4:30 a.m. with prescriptions for 32 grams of Silvadene cream to be applied twice a day for ten days and 30 pills of 600 mg Motrin three times a day as needed for pain and fever. Docs. 37-4 at 15 & 107-1 at 5. The discharge instructions did not

23

recommend a follow-up appointment at the hospital but instructed Plaintiff to return to the emergency department if symptoms worsened or new symptoms developed. Docs. 37-4 at 18 & 55 at 7.

Plaintiff arrived back at Easterling at 5:15 a.m. on July 27, 2014. Doc. 41-1 at 3. His Corizon progress notes indicate that he was to remain in the infirmary for observation or until he could be seen by Darbouze. Doc. 107-2 at 42. According to Plaintiff, he was supposed to stay in the infirmary for a couple of weeks so that his bandages could be changed promptly, but three hours later he was released into the prison population, and then he was returned to the infirmary three hours later because the two shifts did not communicate about his medical instructions, causing him to have to return to the infirmary while blood and pus oozed from his bandages. Doc. 1 at 18. Darbouze testifies by affidavit that she personally examined Plaintiff and wrote orders for his wounds to be treated and cared for by the nursing staff at Easterling. Docs. 37-4 at 4 & 107-1 at 6. On July 28, 2014, Plaintiff was treated with Cephalexin for his burns and Acetaminophen and Naproxen for pain. Doc. 107-1 at 8. On July 29, 2014, Plaintiff received a prescription for Silver Sulfadiazine ointment for his burns. Doc. 107-1 at 9.

Darbouze recommended that Plaintiff receive treatment at the University of Alabama at Birmingham ("UAB") Burn Clinic. The request was approved July 29, 2014, and Plaintiff was seen at UAB on the same day. Docs. 37-4 at 4–5 & 107-1 at 8. The treating physician at UAB diagnosed Plaintiff with "a burn involving less than 10 percent of TBS" and "[b]urn of the neck," "[b]urn of the scalp," and "[b]urn of the shoulder." Doc. 37-4 at 30. The physician recommended treatment with Polysporin and monitoring for

signs and symptoms of infection. Doc. 37-4 at 30. The UAB notes indicate that Plaintiff should follow up in two weeks. Doc. 37-4 at 31. Plaintiff did not return to UAB in two weeks. Doc. 1 at 18-19.

On July 31, 2014, Plaintiff was prescribed Polysporin. Doc. 107-1 at 9. The nursing staff evaluated Plaintiff's vital signs daily, and they cleaned and dressed his wounds. Doc. 107-1 at 9. Darbouze avers that on August 4, 2014 a medical order was placed in Plaintiff's chart to return to the health care unit at 5:00 a.m. and 5:00 p.m. for wound dressing change and Bacitracin ointment until his burn wounds healed. Docs. 107-1 at 9 & 37-4 at 5. Darbouze avers that Plaintiff was seen in the Chronic Care Unit on September 18, 2014, and notes indicate that he was tolerating his medication well with no complaints. Doc. 37-4 at 5. He was seen again on September 23, 2014, with no complaints. Doc. 37-4 at 5. Plaintiff requested cream for his burns and prescription refills on October 30, 2014. Doc. 37-4 at 5. Plaintiff states that Darbouze refused to issue Plaintiff any "scarring ease creme." Doc. 1 at 19. Darbouze responds that Plaintiff received the creams and ointments prescribed by the UAB specialists. Doc. 37-4 at 6. Darbouze denies delaying or denying Plaintiff's medical needs. Doc. 107-1 at 9.

### 3.    *Applicable Law*

Similar to Plaintiff's Eighth Amendment failure to protect claim, to demonstrate an Eighth Amendment claim based on medical care Plaintiff must show that the Medical Defendants' deliberate indifference to his serious medical needs caused him injury. *See Melton*, 841 F.3d 1220; *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999); *see also Nam Dang*, 871 F.3d at 1280. A serious medical need is "one that has been diagnosed by

a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Melton*, 841 F.3d at 1221–22 (quotation marks and citation omitted). Pain and suffering can constitute a serious medical need. *Id.* Deliberate indifference means that the defendant had "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *Id*. at 1223. The Eleventh Circuit has held that conduct constituting deliberate indifference includes medical care that is denied or delayed without explanation or for nonmedical reasons, grossly inadequate care, "an easier but less efficacious course of treatment," or "medical care that is so cursory as to amount to no treatment at all." *Id.* "On the other hand, 'a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment' does not support a claim of deliberate indifference." *Id.* (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).

### 4.    *Discussion*

At best, Plaintiff can establish only that Darbouze's actions amounted to negligence or a difference in medical opinion as to the best way to treat him, not deliberate indifference. Darbouze was on call the night Plaintiff was assaulted and authorized his transport to the emergency room as soon as she was alerted to his injuries. She examined him upon his return from the hospital, provided him the medications prescribed, ensured his wounds were cleaned and dressed, and referred him for further review by specialists at UAB. Plaintiff received the ointment prescribed at UAB. After his return from UAB, Plaintiff was seen in the Chronic Care Unit and was observed to be tolerating his

medications well with no complaints. Plaintiff may have wanted to return to UAB or receive different medications, but Plaintiff's personal disagreement with the treatment chosen by Darbouze is "a classic example of a matter for medical judgment" and not a constitutional violation. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995). Plaintiff faults medical staff who did not provide him pain relief soon after the assault or who initially released him to the general population when he believes he should have remained in the infirmary. But there is no evidence in this record that Darbouze or the other Medical Defendants had any role in these acts, that the acts were done pursuant to some official policy at Corizon, or that the acts causing Plaintiff harm were anything more than mere negligence. In addition, nothing in the record suggests that Darbouze's individual treatment of Plaintiff established a custom or policy for Corizon, and *respondeat superior* is not a basis of liability for Corizon. *See Howell v. Evans*, 922 F.2d 712, 724 (11th Cir.), *abrogated in part by Richardson v. McKnight*, 521 U.S. 399, 412–14 (1997); *see Hinson v. Edmond*, 192 F.3d 1342, 1347 n.5 (11th Cir. 1999) (recognizing that *Howell*'s treatment of qualified immunity for private employee was "not controlling in light of *Richardson*"). As a result, the court concludes that the medical treatment made the basis of the instant complaint did not constitute deliberate indifference. Plaintiff's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010). The record is therefore devoid of evidence—significantly probative or otherwise—showing that the Medical Defendants acted with deliberate indifference to a serious medical need. Summary judgment is due to be granted in favor of the Medical

Defendants.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The ADOC Defendants' motion for summary judgment be GRANTED.

2.      The Medical Defendants' motion to dismiss be DENIED.

3.      The Medical Defendants' motion for summary judgment be GRANTED.

4.      Judgment be GRANTED in favor of Defendants.

5.      This case be DISMISSED with prejudice.

6.      The costs of this proceeding be taxed against Plaintiff.

It is further ORDERED that on or before **August 1, 2018,** the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 18th day of July, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE